IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

ANDERSON DIVISION

| | |
|---|---|
| Kendria Qualls, ) | |
| ) | Civil Action No. 8:04-0984-GRA-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Lowe's Home Centers, Inc., ) | |
| d/b/a Lowe's Companies, Inc., ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. In her complaint, the plaintiff alleges causes of action for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, violation of the Family and Medical Leave Act (FMLA), breach of contract, breach of contract accompanied by a fraudulent act, and breach of the covenant of good faith and fair dealing. In her response to the defendant's motion, the plaintiff expressly abandoned her FMLA claim and her claim for breach of the covenant of good faith and fair dealing.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff worked for the defendant from November 1998 through August 16, 2003 (compl. ¶ 6). During her employment, she worked at four separate store locations in South Carolina and Virginia (pl. dep. 47). She also performed a variety of job functions, including greeter, customer service associate, team leader, and assistant department manager (pl. opp. ex. B). She transferred to the defendant's store in Easley, South Carolina, in June 2001 as a customer service representative (pl. dep. 47).

During her employment, she also took leaves of absence on two occasions for the birth of her children: the first from September 5, 2001, until January 28, 2002, and the second from November 5, 2002, until March 14, 2003 (pl. dep. 58; compl. ¶ 8). Approximately one or two weeks after returning from her second maternity leave, the plaintiff met with Store Manager Greg Simmons and Human Resources Manager Amy Cornwell to request "set work hours" from 8:00 a.m. to 5:00 p.m., Monday through Friday, in order to meet child care needs and possibly to go back to school (pl. dep. 62-63). According to the plaintiff, Simmons and Cornwell agreed, but the plaintiff also understood that this arrangement was "indefinite" and that she was not "guaranteed" set work hours (pl. dep. 63, 114).

On April 12, 2003, the plaintiff was asked to move as a customer service representative from the lawn and garden department to the home and decor department. She agreed (pl. dep. 65-66).

In June 2003, Simmons retired and was replaced as Store Manager by Sheldon Grigg (pl. dep. 62, Grigg dep. 18). Upon his arrival at the Easley store, Grigg noticed that several full-time employees, including the plaintiff, who were expected to work flowed work schedules actually were working schedules that appeared to be fixed (Grigg dep. 24, 30). The defendant's policy and practice requires full-time employees, except

those in certain key positions[1] or specialized positions,[2] to work flowed schedules, i.e., to be available to work any day of the week as scheduled between the hours that the store is open (Hudson dep. 9, Grigg dep. 37). Part-time employees do not have the same availability requirements as full-time employees with flowed work schedules; they are scheduled according only to their availability (Hudson dep. 9, Grigg dep. 35). Rather than working a fixed-schedule, part-time employees are scheduled for varying hours depending upon sales volume (Grigg dep. 40). Thus, depending upon the store's sales volume, part-time employees generally work between 10 and 30 hours per week (Grigg dep. 60; Hudson dep. 20; Cornwell dep. 19). To develop work schedules, the defendant uses scheduling software called StaffWorks, which forecasts work schedules based on expected tasks needed in the store using historical data and cash register data (Grigg dep. 21-22; Cornwell dep. 23).

        To ensure consistent treatment of all employees, the only exceptions Grigg allowed to this policy and practice were for employees with a documented medical need for a set work schedule or with a written agreement specifying a set work schedule (Grigg dep. 34; Stuckey dep. 15). Thus, Grigg and Zone Manager Lisa Hudson met with each full-time employee working a set schedule to determine the purpose and whether they had supporting documentation (pl. dep. 70; Hudson dep. 19). During her meeting, the plaintiff explained that she needed to work a fixed schedule to respond to child care needs (pl. dep. 73). Because this was not a legitimate exception to the flowed work schedule, Grigg allowed the plaintiff two weeks to make alternative arrangements for child care, but he also gave her the option to move to a part-time position to work according to her availability (pl.

---

[1] Key positions include store management in operations, administration, and sales; zone managers; department managers; and sales specialists. Employees holding key positions observe a corporate work schedule and are required to work weekends on a rotating basis and/or opening and closing hours on a rotating basis.

[2] Specialized positions include night stocking in which the employee works only at night, credit and special order sales coordinators who must deal with creditors and vendors during set daytime hours, and a few receiving and pricing positions.

dep. 74; Hudson dep. 20). She was not able to secure alternative child care arrangements; thus, she agreed to move to a part-time position if she could maintain 20 to 31 hours per week (pl. dep. 79). She admits, however, that Grigg told her that he could not make exceptions for one employee but also had to consider other employees who desired a certain number of hours (pl. dep. 114).

Around this same time, the plaintiff was asked to move from the home and decor department to a cashier position at the front end of the store because the front end was short staffed (pl. dep. 69). She agreed to do so (pl. dep. 72). Her transfer was effective on or around July 19, 2003 (pl. dep. 66).

During her first two weeks as a part-time employee, the plaintiff's scheduled hours dropped to 15 and 17 per week respectively (pl. dep. 80). When she complained to Grigg, he told her "that was the way the computer projected them out" (pl. dep. 80). The next week hours were up to "20 something" but then fell to 10 (pl. dep. 82). According to the plaintiff, she complained to Grigg, Cornwell, Hudson, and a male manager whose name she cannot remember (pl. dep. 100). She specifically complained to Cornwell that she was being "singled out" because other people who worked the front end were scheduled for more hours than she was (pl. dep. 102). The plaintiff did not complain that she was being treated differently than male employees and she did not complain of "discrimination"; rather, she complained that she was being treated differently "not [as] a female, but as a working mother" (pl. dep. 102, 107). She did not make this complaint to Hudson, Grigg or the other male manager; to them she complained only that her hours had dropped (pl. dep. 104-05, 107).

The plaintiff claims that she was treated more harshly by her supervisors after she complained to them about her hours dropping (pl. dep. 111). Specifically, she claims that the harsh treatment was the "expressions" on her supervisors' faces – she felt they were "disgusted with her" and that it showed on their faces (pl. dep. 112, 116).

Meanwhile, on August 8, 2003, the plaintiff received a written warning from her supervisor, J. B. Stuckey, for poor performance during a mystery shop (pl. dep. 91 and ex. 5). During a monthly mystery shop at the Easley store by an independent company, the plaintiff failed to greet the customer, failed to ask him if he found everything he needed, and failed to invite the customer to return to the store (pl. dep. 91 and ex. 5; Stuckey dep. 19, 22). The plaintiff claims this written warning was a ploy to push her out of the store (pl. dep. 94). However, the plaintiff admits that she may have been feeling bad that day and failed to engage with the customer as expected (pl. dep. 93).

After she received the written warning, the plaintiff submitted a letter of resignation to be effective on August 15, 2003 (pl. dep. 117 and ex. 6). On August 13, 2002, however, she submitted a letter to Cornwell stating that she wished to withdraw her resignation (pl. dep. 119 and ex. 7). Grigg and Cornwell would not allow her to rescind her resignation (pl. dep. 119). Grigg does not recall ever allowing an employee to rescind a resignation (Grigg dep. 94). He did not allow the plaintiff to do so because her hours had already been reallocated to other employees, she had a recent poor mystery shop performance, and the fact that she wanted to resign at all indicated that she was unhappy – he wanted employees to be happy (Grigg dep. 97).

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed

"material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather the non-moving party must demonstrate that specific material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## ANALYSIS

*Sex Discrimination*

The plaintiff alleges that she was treated more harshly than men because she was not allowed to retain fixed hours and to remain a full-time employee but male employees were allowed to do so (pl. opp. 6).

The court first analyzes claims of sex discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). The allocation of proof is as follows: (1) the plaintiff-employee must first establish a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant-employer to articulate a legitimate non-discriminatory reason for its actions; and (3) if the defendant carries this burden, the plaintiff must then establish by a preponderance of the evidence that the reason articulated by the employer is a pretext to mask unlawful discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802-03).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because "[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519) (emphasis in original). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated." *Id*. It is the plaintiff's burden to create an inference that the defendant's proffered reason is a pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair – but nondiscriminatory – employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir. 1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *Ross*, 759 F.2d at 365.

To establish a *prima facie* case, the plaintiff must show that (1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) she was subjected to an adverse employment action, and (4) she was treated differently than similarly situated persons outside the protected class. *Gutherie v. Blue Ridge Savings Bank*, 159 F.Supp.2d 903, 908 (W.D.N.C. 2000). Here, the plaintiff fails to present sufficient evidence to establish a *prima facie* case of sex discrimination.

Although the plaintiff clearly is in a protected class as a female, she does not allege that she was discriminated against as a female. Rather, she contends that she was singled out and treated differently "not as a female, but probably as a mother. Not [as] a female, but as a working mother" (pl. dep. 102). Other courts that have considered this claim, however, have held that "child-rearing is not a sex-plus characteristic protected by Title VII . . . or any other federal or state anti-discrimination statute." *Guglietta v. Meredith Corp.*, 301 F.Supp.2d 209, 214 (D.Conn. 2004).

The plaintiff in *Guglietta* presented claims similar to those presented by the plaintiff here. Specifically, she requested a certain shift in order to accommodate her childcare needs. 301 F.Supp.2d at 211. Although she was allowed to work the requested shift for some time, she protested when her schedule was subsequently changed because she did not have child care to assist during her new hours. *Id.* After she was terminated for refusing to accept the assigned shift, she sued her employer for, *inter alia*, sex

discrimination. *Id.* at 211-12. Specifically, she claimed that "she was subjected to adverse employment action because she is a female with a child." *Id.* at 213. The court explained,

> [a]lthough Plaintiff seemingly contends that her status is that of a "woman with a child," her actual claim appears to be that of a "woman with childcare difficulties." . . . Initially, the courts which have considered the issue have held that child care is a gender-neutral trait. "A disservice is done to both men and women to assume that child-rearing is a function particular to one sex." *Record v. Mill Neck Manor Lutheran School*, 611 F.Supp. 905, 907 (E.D.N.Y. 1985); *Barnes v. Hewlett-Packard Co.*, 846 F.Supp. 442, 445 (D.Md. 1994) (caring for medical needs of child gender-neutral and "could have been administered as well by her husband as by herself"); *Piscottano v. Metropolitan Life Ins. Co.*, 118 F.Supp.2d 200, 212 n.5 (D.Conn. 2000) (gender based assumptions made about child care duties a mother must "necessarily" engage in are questionable).

*Id.* at 214. This court agrees that child-care responsibilities impact working mothers *and working fathers*. The plaintiff in the case at bar does not contend that she was treated differently because she is a female. However, her complaint that she was treated differently as a working mother is simply not protected by Title VII.

Furthermore, the plaintiff has failed to establish that she was treated differently than similarly situated persons outside her "class." She has neither established nor even alleged that working *fathers* were treated more favorably. Rather, she points only to two male employees who she claims were allowed to maintain fixed schedules as full-time employees. She is unable, however, to identify either of these employees, much less establish that they were similarly situated to her or treated differently. This is insufficient to establish disparate treatment.

Moreover, the evidence establishes that, in fact, the defendant treated male and female employees equally. When Grigg recognized that certain full-time employees were working fixed schedules in violation of the defendant's policy and practice, he investigated reasons for the fixed schedules with each of the six full-time employees at issue, including the plaintiff. Of this group, the plaintiff and a male co-worker, Jeff Israel,

were the only two employees who did not have a documented medical need for the fixed schedule or a written agreement. Accordingly, neither the plaintiff nor Israel were allowed to continue working a fixed schedule (Grigg dep. 53). In light of this evidence, the plaintiff cannot establish a *prima facie* case of sex discrimination, and this claim should be dismissed on summary judgment.

### *Retaliation*

The plaintiff also claims that the defendant retaliated against her for her complaints of discrimination. In her deposition she complained that her supervisors treated her more harshly after she complained that she was being treated less favorably than male employees. Specifically, she bases her retaliation claim on the "expressions" on her supervisor's faces which she felt showed that they were "disgusted with her." In her opposition to the defendant's motion for summary judgment, the plaintiff focuses her retaliation complaint on the reduction of her hours and on the defendant's refusal to allow her to rescind her resignation.

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]" 42 U.S.C. §2000e-3(a); 29 U.S.C. §623(d). In order to establish a *prima facie* case of retaliation, the plaintiff must show that "(1) she engaged in a protected activity; (2) the employer took adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmnt.*, 259 F.3d 261, 271 (4th Cir. 2001) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001)).

Viewing the evidence in a light most favorable to the plaintiff, she complained only once of discrimination. Specifically, she complained to Cornwell that men were being treated better than she was (pl. dep. 102). This is sufficient to satisfy the first element of a *prima facie* case of retaliation, i.e., she engaged in protected activity.

The plaintiff, however, cannot establish the second or third elements of a retaliation claim. Expressions on the faces of her supervisors which suggested to the plaintiff that they were disgusted with her simply do not rise to the level of an adverse employment action absent any allegation or evidence that these expressions altered a term, condition or benefit of the plaintiff's employment. *Munday v. Waste Management of N. Am. Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (manager's conduct in yelling at employee and telling others to ignore and to spy on her was not adverse employment action). Thus, to the extent that the plaintiff bases her retaliation complaint on these alleged expressions, she cannot establish a *prima facie* case of retaliation.

The plaintiff complains that her hours were reduced as retaliation. However, the plaintiff moved to a part-time position when she could not arrange for child-care to accommodate her family's needs. Her hours were necessarily reduced because she chose to move from a full-time position to a part-time position. Under these circumstances, a reduction of hours does not constitute an adverse employment action. Moreover, the plaintiff did not complain to Cornwell that men were treated more favorably until *after* her hours had been reduced. Thus, the plaintiff cannot establish a causal connection between her protected activity and the reduction of her hours. Consequently, this treatment does not satisfy the second or third elements of a *prima facie* case of retaliation.

Similarly, the defendant's refusal to rescind her resignation does not constitute an adverse employment action. The plaintiff submitted a letter of resignation to the defendant indicating that she would resign after working a certain notice period. This was the plaintiff's decision, and the fact that she chose to work a notice period – rather than

abruptly departing the defendant's employ – indicates that she did not view her employment conditions as so unbearable that she could not bear to work at all.  By submitting her letter of resignation, the plaintiff communicated her decision to terminate her employment relationship.  Once the defendant accepted her resignation, there was no obligation to allow her to rescind.  Thus, refusing to do so cannot constitute an adverse employment action.

Meanwhile, the plaintiff also cannot establish a causal connection between her complaint and the defendant's refusal to rescind her resignation.  There is no evidence that the defendant has ever allowed any employee to rescind a resignation.  Moreover, Grigg explained that he did not allow the plaintiff to do so because her hours had already been reallocated to other employees, she had a recent poor mystery shop performance, and the fact that she wanted to resign at all indicated that she was unhappy.  Indeed, Grigg was aware that the plaintiff had complained about her hours as a part-time employee, but there is no evidence that he was aware that the plaintiff had complained to Cornwell that she was being treated less favorably than male employees.  There is simply no evidence to establish a causal connection between her complaint and the defendant's refusal to rescind her resignation.  Based on the foregoing discussion, the plaintiff cannot establish a *prima facie* case of retaliation based on the refusal to rescind her resignation.

***Contract Claims***

The plaintiff also alleges state law causes of action for breach of contract and breach of contract accompanied by a fraudulent act.  As it is recommended that summary judgment be granted on the plaintiff's federal claims, the court should decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims.  *See* 28 U.S.C. §1367(c).

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, summary judgment should be granted on the plaintiff's sex discrimination and retaliation claims, and the court should decline to exercise jurisdiction over the remaining state law claims.

s/William M. Catoe
United States Magistrate Judge

May 31, 2005

Greenville, South Carolina